FOURNET, Chief Justice.
We granted a writ of certiorari on the petition of Pierson Lewis in order to review the judgment of the Court of Appeal, Third Circuit, reversing the judgment of the trial court rendered in his favor, in a concursus proceeding instituted by Humble Oil & Refining Company making Lewis and his estranged wife, Mrs. Janice Butler Lewis, parties defendant, to determine the ownership of $2,505.25 in its possession representing the purchase price of a one-half of interests in oil due' pursuant to an assigned royalty interest to Lewis. See, La.App., 150 So.2d 796.
*133 The facts reveal that sometime during June, 1959, E. W. Marks employed the services of Lewis, an oil and gas lease broker, to acquire a seventy-five per cent working interest in approximately 203 acres located in what is known as the Bosco Oil Field in Acadia Parish, and as consideration for such services, Lewis was to receive a three per cent overriding royalty. The leases were acquired and in August, 1959, were delivered to Marks, who on October 26, 1959, executed an instrument assigning the override to Lewis. The document was given to John Maxwell, Marks’ attorney, with instructions that it would be delivered to Lewis after it was determined that the leases acquired for Marks by him actually consisted of a seventy-five per cent working interest and titles thereto were merchantable.
On November 29, 1959, Maxwell, having received notice from Lucius F. Suthon, a member of the law firm of Jones, Walker, Waechter, Poitevent, Carrere and Denegre of New Orleans, who had been employed by the Merchants National Bank of Mobile, Alabama, to examine the titles to these properties, which together with other properties, were being pledged as security for a loan of $300,000 to Marks, certifying that Marks had acquired a seventy-five per cent working interest in the Bosco area and the titles thereto were merchantable, turned over the assignment to Lewis on that same day, which he recorded in Acadia Parish on December 1, 1959. In the meantime, on November 12, 1959, Lewis had secured a judgment decreeing a separation from bed and board from his wife.
Mrs. Lewis contends the document of October 26th was given in payment for services rendered during the existence of the community and therefore forms a part thereof under the express provisions of the Revised Civil Code.[1]
On the other hand, it is Lewis’ contention, in which he was upheld by the district court, that title to these royalties did not pass until the document was delivered to him on November 29, 1959, at which time the community which formerly existed had been dissolved, therefore, the royalties became his separate property, citing Wampler v. Wampler, 239 La. 315, 118 So.2d 423.
According to the facts of that case, M. R. Corley, who had secured the signatures of 8 of the 18 owners of property to an oil and gas lease affecting same, executed an assignment thereof in July of 1952 to Wampler Brothers, a partnership composed of Floyd Wampler and the defendant, Charles Wampler, for the recited consideration of $1,000. This incomplete lease, its assignment, and the recited consideration of $1,000 were all deposited in escrow with a Mr. David, an attorney of Shreveport, with the stipulation that he would pay the $1,000 to Corley only after Corley had obtained the signatures of the remaining ten owners of the property to this lease, and the attorney had found the title thereto to be a good and merchantable one, the assignment, at that time, to be delivered to *134 Wampler Brothers and the cash consideration to be paid to Corley. On July 23, 1952, the last lessor had signed the oil and gas lease, hut the title was not approved by Mr. David until September 23, 1952. In the meanwhile, on August 15, 1952, the defendant, Charles Wampler, was divorced from his wife.
In holding the assignment in the Wamp-ler case did not form a part of the community of acquets and gains formerly existing between Charles Wampler and his wife, this court relied on Article 2043 of the Revised Civil Code, declaring its provisions “parallel the general law of escrow” and were consonant with Article 2471 of the code, which provides that “A sale, made with a suspensive condition, does not transfer the property to the buyer, until the fulfillment of the condition,” and concluded that these conditions (the delivery of the assignment and the payment therefor were not to be made until the remaining 10 signatures to the lease had been secured and the title thereto approved by the attorney) suspended the assignment, which was neither binding nor enforceable by or on either party until they had been fulfilled.
The Court of Appeal, in a well considered opinion, reversed the trial court, noting the obvious factual difference between the Wampler case and the one now under consideration. In its opinion it was pointed out that “In the Wampler case * * * a suspensive condition existed, because the obligation was not to take effect until the consideration had been paid and a valid title had been delivered, neither of which events occurred until after the divorce had been rendered. In the instant suit, however, we think the obligation took effect when the assignment was executed on October 26, 1959, because both parties had performed all obligations which they had assumed ; and that any conditions which may have existed after that date were resolutory in nature, that is, the assignment was liable to be defeated if it should be later determined that Lewis had not actually delivered a 75 per cent working interest in the leases. * * * ”
We think the foregoing pronouncement of the Court of Appeal is a proper evaluation of the status in law of the obligations involved in the two cases, and their effect. From a reading of the opinion in the Wampler case it is obvious that the decision rested primarily on the first portion of the first paragraph of Article 2043 of the Revised Civil Code, as reflected by the emphasis in the opinion as follows:
“The obligation contracted on a suspen-sive condition, is that which depends, either on a future and uncertain event, or on an event which has actually taken place, without its being yet known to the parties.
“In the former case, the obligation can not be executed till after the event; in the latter, the obligation has its effect from the day on which it was contracted, but it can not be enforced until the event be known.”
Clearly the factual situation in the instant case brings it squarely within the provisions of the latter portion of the first paragraph of Article 2043, which declares that “The obligation contracted * * * depends * * * on an event which has actually taken place, without its being yet known to the parties,” for Lewis had acquired the leases and transferred them to Marks, as agreed, and Marks had, in payment thereof, on October 26, 1959, executed the assignment of an overriding royalty interest therein, leaving for determination whether the leases delivered by Lewis actually consisted of a 75% working interest. Once it was determined that Lewis had acquired this 75% working interest, the assignment made by Marks, under the plain provisions of the article, had “its effect from the day on which it was” executed, i. e., October 26, 1959, prior to November 12, 1959, on which day Lewis had secured a legal separation from his wife.
It necessarily follows, therefore, that the Court of Appeal properly adjudged the amount deposited in the registry of the *135 court by the Humble Oil & Refining Company ($2,505.25) was the property of the defendant, Mrs. Lewis, Mr. Lewis having been previously paid his half interest, which is not in contest here.
For the reasons assigned, the judgment of the Court of Appeal for the Third Circuit is affirmed.
HAMITER, J., concurs in the result.
McCALEB, J., dissents with written reasons.
SUMMERS, J., dissents.

. R.C.C. Art. 2399. “Every marriage contracted in this State, superinduces of right partnership or community of ac-quets or gains, if there be no stipulation to the contrary.”
R.C.C. Art. 2402 provides in part:
“This partnership or community consists of the profits of all the effects of which the husband has the administration and enjoyment, either of right or in fact, of the produce of the reciprocal industry and labor of both husband and wife, and of the estate which they may acquire during the marriage, either by donations made jointly to them both, or by purchase, or in any other similar way, even although the purchase be only in the name of one of the two and not of both, because in that case the period of time when the purchase is made is alone attended to, and not the person who made the purchase. * * * ”
R.O.O. Art. 2405. “At the time of the dissolution of the marriage, all effects which both husband and wife reciprocally possess, are presumed common effects or gains, unless it be satisfactorily proved which of such effects they brought in marriage, or which have been given them separately, or which they have respectively inherited.”